# No. 23-6379, 23-6953

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

**UNITED STATES,** *Plaintiff-Appellee*

*v.*

**JAMES VELISSARIS, AKA SEALED DEFENDANT 1**

*Defendant-Appellant*

---

Appeal from the United States District Court for the
Southern District of New York
Hon. Denise Cote, District Judge
Case No. 22-cr-105

---

**Opening Brief of Appellant James Velissaris, AKA Sealed Defendant 1**

---

AARON D. LINDSTROM
**BARNES & THORNBURG LLP**
171 MONROE AVE. SE, SUITE 1000
GRAND RAPIDS, MI 49503
616-742-3931

*Counsel for Defendant-Appellant,*
*JAMES VELISSARIS, AKA SEALED DEFENDANT 1*

# Table of Contents

**Page**

Table of Authorities.................................................................iii

Jurisdictional Statement......................................................... 1

Statement of Issues ................................................................ 2

Statement of the Case ............................................................ 3

Statement of Facts and Procedural History ........................... 5

I.    Velissaris repeatedly discloses to investors that Infinity Q
      may factor its own judgment into valuations. .............. 7

II.   During the pandemic, when the market was very volatile,
      Velissaris applied his judgment to increase valuations. ............. 10

III.  A grand jury indicts Velissaris for securities fraud. ................... 12

IV.   Velissaris voluntarily surrenders, initially pleads not guilty,
      and prepares for trial. .................................................. 14

V.    Velissaris pleads guilty. ............................................... 15

VI.   The SEC reaches a settlement with Bloomberg ......................... 18

VII.  Velissaris moves to withdraw his plea. ..................................... 19

VIII. The district court denies Velissaris's motion to withdraw his
      plea. ........................................................................ 20

IX.   The court sentences Velissaris to 15 years and denies bail
      pending appeal. ........................................................ 22

X.    The court orders Velissaris to pay $126 million in
      restitution.................................................................. 23

Summary of Argument........................................................... 23

i

Standard of Review ..................................................................... 26

Argument ...................................................................................... 27

I.    Velissaris is actually innocent of disclosure fraud. ................... 27

      A.    Velissaris disclosed what he is alleged to have
            concealed. ............................................................................. 27

      B.    Velissaris did not admit to the alternate theory of
            fraud that the court relied on. ............................................ 36

II.   Even if Velissaris is not allowed to withdraw his guilty plea,
      the restitution amount should be vacated because it rests on
      an unsound methodology. ............................................................. 41

Conclusion ...................................................................................... 50

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*Brown v. E.F. Hutton Grp., Inc.,*
   991 F.2d 1020 (2d Cir. 1993) ........................................................ 34, 35

*Dodds v. Cigna Securities, Inc.,*
   12 F.3d 346 (2d Cir. 1993) ............................................................ 34, 35

*Enron Corp. Sec., Derivative & ERISA Litig.,*
   235 F. Supp. 2d 549 (S.D. Tex. 2002) .................................................. 35

*Halperin v. eBanker USA.com, Inc.,*
   295 F.3d 352 (2d Cir. 2002) ............................................................... 35

*I. Meyer Pincus & Associates, P.C. v. Oppenheimer & Co.,*
   936 F.2d 759 (2d Cir. 1991) ........................................................ 32, 35

*Irizarry v. United States,*
   508 F.2d 960 (2d Cir. 1974) ........................................................ 38, 40

*McCarthy v. United States,*
   394 U.S. 459 (1969) ............................................................................ 36

*Olkey v. Hyperion 1999 Term Tr.,* Inc.,
   98 F.3d 2 (2d Cir. 1996) .......................................................... 33, 34, 35

*People v. Thousand,*
   465 Mich. 149 (2001) .......................................................................... 40

*United States Commodity Futures Trading Comm'n v. Wilson,*
   No. 13 CIV. 7884 (RJS), 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018) 39

*United States v. Abdelhadi,*
   327 F. Supp. 2d 58 (E.D. Va. 2004) .................................................... 27

*United States v. Farner,*
   251 F.3d 510 (5th Cir. 2001) .............................................................. 41

*United States v. Fernandez*,
  722 F.3d 1 (1st Cir. 2013) .................................................................41

*United States v. Finazzo*,
  850 F.3d 94 (2d Cir. 2017) ................................................. 42, 43, 44

*United States v. Gushlak*,
  728 F.3d 184 (2d Cir. 2013) ..............................................................41

*United States v. Hsu*,
  155 F.3d 189 (3d Cir. 1998) ..............................................................41

*United States v. Maher*,
  108 F.3d 1513 (2d Cir. 1997) ............................................................36

*United States v. McIntosh*,
  704 F.3d 894 (11th Cir. 2013) ..........................................................36

*United States v. Mitchell*,
  No. 2:07-CR-149TS, 2009 WL 603198 (D. Utah Mar. 9, 2009) ...........26

*United States v. Overton*,
  24 F.4th 870 (2d Cir. 2022) ..............................................................26

*United States v. Tanner*,
  942 F.3d 60 (2d Cir. 2019) ......................................................... passim

## OTHER AUTHORITIES

*In the Matter of Bloomberg Fin. L.P. Respondent.*,
  Release No. 11150, 2023 WL 369464 (Jan. 23, 2023) ....... 18, 46, 47, 48

Perkins & Boyce,
  Criminal Law (3d ed.), at 634.............................................................40

U.S. Sentencing Guidelines § 2B1.1(B)(1) ..............................................50

iv

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 over the allegations that James Velissaris violated provisions of Title 15 of the United States Code and other federal statutes. The district court entered final judgment on April 7, 2023, and entered an amended judgment on August 3, 2023. Velissaris filed timely notices of appeal on April 19, 2023, and on August 16, 2023. This Court's jurisdiction rests on 28 U.S.C. § 1291.

1

## STATEMENT OF ISSUES

1.      In this securities-fraud case, the prospectus and other disclosures informed investors that James Velissaris could use his own judgment and could depart from the valuation service he was using for valuing securities. Although he told investors that he would rely on the independent valuation service, when valuing certain derivatives, he then applied his judgment to alter the service's valuations. Velissaris pled guilty premised on the theory that he failed to disclose to investors that he was making adjustments to the valuation services' valuations. Should he be allowed to withdraw his guilty plea based on actual innocence, as he in fact disclosed that the valuations would not be wholly independent of his judgment?

2.      The restitution amounts were calculated by relying on the valuation service, BVAL. Did the district court err in concluding that "whether BVAL is a reliable tool is largely immaterial," in contradiction to this Court's requirement that restitution must be based on a sound methodology?

2

## STATEMENT OF THE CASE

This appeal in a criminal case arises from Judge Denise Cote's denial of James Velissaris's motion to withdraw his guilty plea. (App. A-919.)

Velissaris pled guilty to conduct that was not a crime and then was not allowed to withdraw his guilty plea. Specifically, he pled guilty to securities fraud premised on the theory that he failed to disclose to investors that he was making adjustments to a Bloomberg tool that he was using to value the over-the-counter derivatives in his company's funds and that he was thus mismarking their valuations. But he repeatedly disclosed to investors, through a prospectus, annual reports, and other documents, that he *could* rely on his own judgment to depart from the third-party valuations.

Velissaris should be allowed to withdraw his guilty plea because he is actually innocent: he cannot be guilty of disclosure fraud when he disclosed the very thing that he is accused of concealing, namely that he could mark valuations based on his judgment, not solely the judgment of a third-party service. For example, he disclosed in a prospectus that his company could depart from a pricing service when the service

3

"provides a valuation that *in the judgment of the Adviser* does not represent the security's fair value" and that he would use a valuation process that includes "*reliance on judgment.*" (App. A-740 (emphasis added); *see also* App. A-885 (annual report disclosing that valuations for the relevant swaps would include "[*s*]*ignificant unobservable inputs*, including the Fund's own assumptions") (emphasis added).)

Further, after Velissaris was denied leave to withdraw his guilty plea, he challenged the restitution amounts as being calculated on an unreliable basis. Specifically, he noted that the tool being used to calculate the loss and restitution amount was BVAL, and that the SEC recently stated, in an order making findings and approving a settlement, that BVAL's methodology was flawed for thinly traded securities, and was sometimes basing valuations on a single input. His expert also explained that BVAL was systematically undervaluing the derivatives. In response, the district court stated that "whether BVAL is a reliable tool is largely immaterial" to whether the valuations based on BVAL were accurate and denied Velissaris's request for a hearing on the issue. That ruling contradicted this Court's decisions recognizing that restitution must be calculated using a sound methodology. Further,

because these calculations also affect the amount of loss on which his sentence rests, the amount of loss should be recalculated. As explained in this brief, this Court should reverse, allow Velissaris to withdraw his guilty plea, and allow Velissaris to proceed to trial. At a minimum, the Court should vacate the restitution penalty and loss calculation and remand for recalculation and resentencing.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

This case arises out of an alleged scheme by James Velissaris to defraud investors from 2018 through February 2021. (App. A-938.) Velissaris served as the chief investment officer for Infinity Q Capital Management LLC, a company he founded in 2014 at the age of 30. He had significant investing experience, having worked for investment firms since college. (App. A-251 ¶ 94; *see also* App. A-250 ¶ 91 (earned degree in economics from Harvard and a master's from Columbia in operations research).) As Infinity Q's chief investment officer, he oversaw the management of its two funds, a mutual fund (the Infinity Q Diversified Alpha Fund) and a private fund (the Infinity Q Volatility Alpha Fund).

These two investment funds included over-the-counter derivatives that are not traded on the public exchanges. (App. A-922.) As a result, the values of these derivatives cannot be established simply by pointing to a price on an exchange. Instead, investment funds and banks that trade in over-the-counter derivatives use models to calculate what they believe the fair value of the derivatives to be. (App. A-923.)

The particular over-the-counter derivatives in the Infinity Q funds were volatility swaps, variance swaps, and corridor variance swaps. (App. A-922.) The value of these derivatives depends on the volatility or the variance of the underlying asset's value during the contract period.

One modeling tool for determining the value of these over-the-counter derivatives is a service called Bloomberg Valuation Service (BVAL); it allows users to model over-the-counter derivatives using customizable templates. (App. A-923.) This third-party model allows the user to input both data (such as the terms of the deal) and assumptions about the market. (*Id.*) Infinity Q used BVAL as part of its valuation process. (*Id.*)

6

## I.    Velissaris repeatedly discloses to investors that Infinity Q may factor its own judgment into valuations.

From 2018 through February 2021, Infinity Q repeatedly disclosed to investors in both the mutual fund and the private fund that Infinity Q had the discretion to depart from the prices provided by third-party models when it believed the model's prices did not represent fair value.

For example, Infinity Q sent a private offering memo and a private placement memo to all domestic and off-shore investors in July and August of 2018. (App. A-649; App. A-590.) In sections entitled "Valuation," both disclosures explained that where a "pricing service, quote or quotes may not provide a reliable indication fair value, Infinity Q will value each such Position based on relevant information, including, *without limitation*: (i) an internally or externally developed memo/model . . . and/*or (ii) such other factors as may be deemed appropriate*." (App. A-693 (emphasis added); App. A-625 (same).) The disclosures also specifically addressed over-the-counter derivatives, explaining that Infinity Q would review Bloomberg's valuations for reasonableness. (App. A-695 ("*Infinity Q utilizes Bloomberg*, broker quotes, and counterparty valuations to provide a fair value for these securities. At each month end, valuations [for the private fund] are

7

compared to the values provided by counterparties *for reasonableness*.")
(emphasis added); App. A-626 (same).)

In December 2018, Infinity Q repeated these disclosures in the
policies-and-procedures manual that it sent to investors. (App. A-519.)
Like the earlier disclosures, the December 2018 disclosure reiterated
that "Infinity Q will value each Position" based on an external model or
"*such other factors as may be deemed appropriate*." (App. A-519
(emphasis added).)

Infinity Q's prospectus for the mutual fund, which was also
provided to investors in December 2018, again disclosed that Infinity Q
had discretion to adjust valuations based on its own judgment. The
prospectus states that when "the Fund's pricing service does not provide
a valuation (or provides a valuation that *in the judgment of the Adviser*
does not represent the security's fair value) or when, *in the judgment of
the Adviser,* events have rendered the market value unreliable," then "a
security or other asset is valued at its fair value as determined under
procedures approved by the Board." (App. A-740 (emphasis added).) The
prospectus explains that these procedures include Infinity Q exercising
its own judgment: "Valuing securities at fair value is intended to ensure

8

that the Fund is accurately priced *and involves reliance on judgment.*"
(*Id.*)

Further, the Board-approved procedures expressly granted
Infinity Q discretion to price swaps for which market quotations were
not readily available—in other words, for all of the swaps at issue in the
indictment. For example, in an August 2019 disclosure, the "Swaps"
section of the mutual fund's "Policies and Procedures for Valuing
Portfolio Securities and Assets" provides that "[i]f approved Pricing
Services are unable to provide a price, fair value will be determined as
set forth in Appendix C." (*See, e.g.*, App. A-840.) Appendix C in turn
provides that "[e]ach Fund's Adviser is *authorized to make all necessary
determinations of the fair value of portfolio securities and other assets
for which market quotations are unreliable or not readily available.*"
(App. A-846) (emphasis added).

Infinity Q made similar disclosures in the annual report for the
mutual fund, again telling investors that Infinity Q could use its own
judgment in valuation. The mutual fund's annual report was publicly
available on the Infinity Q website throughout all of 2018 through
February 2021, and thus was available to investors. In a section

9

entitled "Securities Valuation," the mutual fund disclosed that the fund deemed "volatility and variance swaps" to be illiquid and therefore classified them as "Level 3 in the fair value hierarchy." (*See, e.g.*, App. A-886.) This is significant because, while noting that it would use "a third party calculation agent to value these positions," the annual report disclosed that "Level 3" securities would be priced according to "[s]*ignificant unobservable inputs, including the Fund's own assumptions* in determining fair value of investments." (App. A-885, 886 (emphasis added).)

## II. During the pandemic, when the market was very volatile, Velissaris applied his judgment to increase valuations.

As an expert for Velissaris explained, "Infinity Q was a 'net buyer of volatility,'" and so "its portfolio of variance swaps would have been expected to increase in value" during the "'unprecedented level of market volatility in 2020'" as a result of the COVID pandemic. (App. A-933 (quoting Saha Report, App. A-118 ¶ 3); *see also* Saha Decl., App. A-912 ¶ 4(b).) For example, a "widely followed measure of market volatility," the "VIX index," set a new high in March 2020 and "remained relatively elevated through the rest of 2020." (Saha Report, App. A-118 ¶ 2). Because "the sum of [Infinity Q's] long positions (whose

value rose with rising volatility) was more than five times larger than its short positions," the overall portfolio of swaps at issue would be expected to have appreciated in value, decidedly so, during the period of high market volatility in February–March 2020 and to remain relatively elevated for the remainder of 2020." (App. A-118–19 ¶ 3; *see also* App. A-912 ¶ 4(b).) In fact, the SEC's in-house expert agreed that "it's believable that they [the Infinity Q funds] have these returns" (i.e., the returns the funds disclosed to the public), that the strategy Infinity Q was employing "could deliver this type of return, which is not exactly outlandish," and that if Infinity Q "held these [fund] positions, [it] could have seen mark to market gains of several hundred million dollars . . . ." (ECF 95-7.) But despite the high volatility of the market during these periods, the BVAL models that Infinity Q used "*systematically undervalue*[d] a majority of the swaps at issue," yielding "valuations that were more than 80% lower than the current version of BVAL" for many swaps at issue." (App. A-119 ¶ 5; *see also* App. A-913 ¶ 4(f).) And even the current version of BVAL produces valuations that depart significantly from the VIX index: "For example, during the month of March 2020, average VIX *rose by 314%* relative to its value in January

2020; by contrast, according to current BVAL's output, the sum of the values of the swaps at issue *declined by 600%* over the same period." (App. A-119 ¶ 6 (emphasis added); *see also* App. A-913 ¶ 4(f).) "This result is not consistent with market reality because, as noted earlier, the sum of the size of the long positions for the swaps at issue was more than five times larger than the short positions during this time." (*Id.*)

To account for the BVAL valuations that were decreasing the value of the swaps, Velissaris made manual adjustments that increased the values based on his judgment and understanding of the market to more accurately reflect the market value of the swaps.

## III.   A grand jury indicts Velissaris for securities fraud.

On February 16, 2022, a grand jury returned an indictment against Velissaris for securities fraud (the count relevant to this appeal) and for five other counts (investment-adviser fraud, wire fraud, false statements to an accountant, conspiracy to obstruct an SEC investigation, and obstruction of an SEC investigation).

The indictment alleged that Velissaris made false and misleading statements to investors "concerning Infinity Q's process for valuing certain over-the-counter ('OTC') derivative securities that made up a

substantial portion" of the funds' holdings. (Indictment, App. A-24 ¶ 1.) It also alleged that he "fraudulently mismarked those securities in ways that did not reflect their fair value." (*Id.*)

As to the statements, the indictment asserted that Velissaris misled investors "that the valuation of Infinity Q's OTC derivative securities would be done using an *independent* third-party service, *without Infinity Q's input into the models*, and based on the true terms of the underlying securities." (App. A-25 ¶ 2 (emphasis added).) The indictment alleges that these statements were false because Velissaris "had substantial input into the marking of the securities, including by manipulating the purportedly independent third-party models that Infinity Q used for valuation" and by altering the model's valuations. (App. A-25 ¶ 3.) The indictment alleges repeatedly—12 times—that Infinity Q represented that the third-party service would be "independent" of Infinity Q's input. (App. A-25–41 ¶¶ 2, 3, 19, 23, 24, & 35; *see also* Gov't Opp'n, App. A-87, 88 (government's brief explaining that "the Government's theory of fraud in this case" was "that Velissaris made misrepresentations about independence of the process for valuing OTC derivative positions in Infinity Q's portfolio").)

The indictment did not mention any of the disclosures noted above, each of which informed investors that Infinity Q would not rely solely on external services but if Infinity Q did not believe that BVAL's valuations were reasonable, it would also use its own judgment in making valuations.

The indictment also alleged that the alterations Velissaris made to the BVAL model arrived at valuations that were not intended to achieve fair value. (*E.g.*, Indictment, App. A-36 ¶ 27.) It alleged that he altered parameters to treat similar swaps differently in the two different funds, eliminated corridors, and used a different annualization factor than the one on the term sheet (App. A-37–38 ¶¶ 28–29). And it alleged that these inputs caused anomalous and even impossible valuations. (App. A-40 ¶ 32.)

## IV. Velissaris voluntarily surrenders, initially pleads not guilty, and prepares for trial.

Velissaris voluntarily surrendered on February 17, 2022, and was released on a $3 million bond, $2 million of which was posted. (Presentence Report, App. A-229.) He surrendered his travel documents. (*Id.*)

When Velissaris was arraigned, he pled not guilty.

14

## V.   Velissaris pleads guilty.

As the November trial approached, James's counsel at the time "told him a guilty plea was best for him, despite his consistent statements that he was innocent," which led him to become passive and withdrawn. (ECF 92-2.) According to an evaluation by a psychologist, James, who was struggling with depression, "shut down and did what he was advised in order to avoid further emotional turmoil and the risk of his legal team abandoning him." (ECF 92-2.)

At a pre-trial hearing, the court considered the government's motion to exclude testimony by Dr. Atanu Saha, an expert on behalf of Velissaris. (App. A-374.) Among other things, Dr. Saha's report addressed flaws in BVAL. (App. A-119–21 ¶¶ 5–8.) The court recognized that this testimony could show that Velissaris's intent in modifying BVAL valuations was "to try to capture more accurately the valuation of the particular security at that moment in time," but the court concluded that flaws in BVAL were "really not relevant here," as it would be a proxy for Velissaris's intent in making alterations. (App. A-375, 376.) The court tentatively excluded the testimony, but specifically stated that the defense would be able "to reapply for the admission of

Dr. Saha's testimony more broadly" at trial (App. A-394), and so did not make a final ruling on the admissibility of the testimony.

Two days later, on November 20, 2022, Velissaris agreed to plead guilty to the single count of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, of 17 C.F.R. § 240.10b-5, and of 18 U.S.C. § 2. (Plea Agreement, App. A-407.) The plea agreement provided that the loss exceeded $65 million, and Velissaris agreed to forfeit $22 million representing proceeds allegedly traceable to the violation and also to pay restitution. (App. A-408.) The government agreed to dismiss the remaining counts at sentencing. (*Id.*) The plea agreement noted that this offense carried a maximum sentence of 20 years, plus three years of supervised release. (App. A-407.)

At the plea hearing, held on November 21, 2022, the district court explained that the count alleged that Velissaris "made fraudulent misrepresentations . . . concerning the process by which the investment fund's over-the-counter derivative positions were marked, falsely representing that they were marked at fair value," and also that he "mismarked the value of over-the-counter derivative positions held by

those investment funds in order to fraudulently inflate their value."

(App. A-420–421.)

On the record, Velissaris made the following statement:

> Between 2018 and February 2021, . . . I made false
> statements of material fact to investors in the Infinity Q
> funds that I managed, and I did so knowingly, willfully,
> and with the intent to defraud. Specifically, I told
> investors that I was using an independent Bloomberg
> system to value the fund's over-the-counter derivatives.
> However, I was making manual adjustments in the
> system which increased the values of over-the-counter
> derivative positions that were reported. I knew that if I
> disclosed what I was doing, investors might have
> decided to redeem their investments or maybe would not
> have made the investments in the first place. Some of
> the communications with investors occurred over the
> phone and by email in the Southern District of New
> York. I acknowledge that my actions caused investors to
> lose money, and for this I am truly sorry. [App. A-425.]

Responding to follow-up questions from the court, he stated that he

made the adjustments "[t]o increase the value of the securities being

held by the fund." (App. A-426.) And he stated that he understood that

he was "doing something wrong" and was "violating the law[.]" (*Id.*) The

court also noted facts relating to jurisdiction. (*Id.*)

Neither the court nor the government put any additional facts on

the record to support the plea. (App. A-414–27.) Velissaris did not plead

guilty to the other counts and did not admit the facts underlying those

17

counts (such as allegations that he submitted false term sheets to an auditor or to the SEC or that he obstructed justice). The plea agreement does not include any additional description of facts. Velissaris also did not admit that he made any alterations to obscure the true value of the securities or to artificially inflate the values, saying only that he made alterations to increase the value of the securities. (App. A-425.)

## VI. The SEC reaches a settlement with Bloomberg based on flaws in BVAL's methodology.

At the same time the government was charging Velissaris with fraud for departing from BVAL's valuations, the government was also investigating Bloomberg because of flaws in BVAL's valuation methodology. *In the Matter of Bloomberg Fin. L.P. Respondent.*, Release No. 11150, 2023 WL 369464 (Jan. 23, 2023); *see also* Op., App. A-951 (district court discussing the SEC order). In the January 2023 order, the SEC found that for securities where "market data is not available or is not corroborated," BVAL uses an "observed comparables algorithm" for valuations. *Id.* ¶ 9. From 2016 through October 2022 (the "Relevant Period" covered by the SEC order), Bloomberg evaluators were "incorporat[ing] data into the observed comparables algorithm, which in certain circumstances could result in BVAL prices that, in the time

period shortly after the incorporation of that single data input (such as a broker quote), were largely based on that single data input." *Id.* ¶ 2, 9. While the SEC order noted this especially with respect to fixed-income securities, it also recognized that this occurred with respect to "certain illiquid, thinly-traded securities for which little observable market data exists, and which would be assigned a lower corresponding BVAL score in the BVAL data provided to customers." *Id.* ¶ 9. As a result, "Bloomberg's customers, some of whom use BVAL prices in connection with the offer, sale, and purchase of securities, were unable to determine that certain BVAL prices were not generated in accordance with the disclosed methodologies." *Id.* ¶ 12. Thus, during the same period when Velissaris was departing from BVAL's valuations that were lower than expected given the volatility of the market, BVAL's valuation methodology was flawed for thinly traded securities and was in some instances based on a single data input.

## VII. Velissaris moves to withdraw his plea.

On March 24, 2023, after consulting with new counsel, Velissaris moved to withdraw his guilty plea, based primarily on the disclosures recited above. (Mem., ECF 95.) He explained that he did not mislead

investors as to Infinity Q's process for valuing the securities, because the disclosure documents for both funds plainly disclosed that Infinity Q had the discretion to depart from the BVAL estimates when BVAL did not represent fair value. He also submitted a declaration from Dr. Saha explaining that BVAL systematically undervalued the swaps at issue. (App. A-913.)

## VIII. The district court denies Velissaris's motion to withdraw his plea.

After denying Velissaris's motion for more time, the district court scheduled the hearing on the plea withdrawal one hour before the sentencing hearing. (ECF 100.) At the hearing, the district court denied his motion. Addressing the government's "Disclosure Theory" (Op., App. A-962), the court characterized as just "a handful of documents" all of the disclosures noted above—the prospectus, the annual report, the private placement memo, the private offering memo, and the policies-and-procedures manual. (*Id.*) The court noted that Velissaris had information about the disclosures when he pled guilty and then stated that the fact that his prior "highly competent counsel" had not raised this argument "alone renders the argument about the documents futile." (App. A-963.) The court noted that Velissaris had admitted "that

20

he manipulated the positions 'with the intent to defraud' and '[t]o increase the value of the securities being held by fraud.'" (App. A-965.)

The court next turned to the government's mismarking theory (App. A-967–70), which it described in much the same way it had described the disclosure theory: "The crucial point is that Infinity Q held BVAL out as the independent method it would use to determine fair market value" but then altered the BVAL calculations "to increase artificially the value" of the funds' positions. (App. A-967–68.) For the mismarking theory, the court concluded that it was "largely immaterial" whether Velissaris's calculations were "objectively correct or not," because Velissaris altered the BVAL calculations "not to make them more accurate" but "to increase artificially the value of positions" held by the funds. (App. A-967–68.) The court did not cite any statements from Velissaris's guilty-plea allocution or any other evidence to support its assertion that Velissaris's alterations were not to make the BVAL valuations more accurate but to artificially inflate the value.

Additionally, the court noted that while it had tentatively concluded that Dr. Saha's report would be excluded, it expressly repeated that it had not made "a final decision about the exclusion of

Dr. Saha's report" and that Velissaris could "reapply for the admission of Dr. Saha's testimony more broadly beyond the one issue" the court had already concluded Dr. Saha could testify about. (App. A-935–36.)

## IX. The court sentences Velissaris to 15 years and denies bail pending appeal.

The court sentenced Velissaris to 15 years of imprisonment for the single count of securities fraud. (App. A-977.)

Although the government had previously stated that it would not be seeking restitution (App. A-242 ¶ 47), the government asked the court to order restitution, with the amount to be determined later, and the court agreed. (ECF 119 at 43.)

At end of the sentencing hearing, Velissaris's counsel asked orally for bail pending appeal, which the court denied. (Tr., ECF 119 at 59:18–20.) Velissaris also filed a motion for release pending appeal, which the court denied the day after it was filed (Op., App. A-984.) The court did not ask whether the government opposed release pending appeal or thought he was a flight risk, and so did not rely on any evidence identified by the government for this determination.

**X.** **The court orders Velissaris to pay $126 million in restitution.**

As to restitution, the government sought $126,281,371.02 in restitution, to be paid to the two Infinity Q funds. (Gov't Letter, ECF 129 at 1.) Specifically, the Diversified Alpha Fund alleged that it lost over $59 million, and the Volatility Alpha Fund alleged that it lost over $67 million. (*Id.* at 2, 3.) Velissaris opposed the restitution amounts on a number of grounds, including that the approximately $100 million in overpayments that the funds alleged were not calculated in a reliable manner. (Velissaris Letter, ECF 130 at 10–11.) He explained that "the BVAL is an inherently flawed tool that does not accurately value the Funds' securities, and he noted that the SEC levied a $5 million fine against Bloomberg in January 2023 because of methodological flaws in BVAL. (*Id.* at 11.) The Court awarded restitution in the amount of $125,969,962.78. (App. A-1032.)

## SUMMARY OF ARGUMENT

The government's theory of fraud when Velissaris pled guilty was that *any* alteration he made constituted a misrepresentation about the independence of BVAL valuation process, regardless of whether those alterations brought the valuations closer to some "true" market value or

23

not. That is why the government and the district court said that the government did not need to establish the true value of the assets to show that he committed fraud. But the disclosures he made in the prospectus, annual report, and other documents are a complete defense to that theory of fraud, because the disclosures show that he had the authority to alter BVAL valuations based on his own judgment about market conditions and about the appropriate value of the derivatives. In short, because he disclosed that he could alter the BVAL valuations based on his judgment, he is not guilty of fraud on the theory that BVAL had to be completely independent of his input.

When Velissaris moved to withdraw his guilty plea, the court reinterpreted the government's theory of fraud as being based on whether the alterations were made to improve accuracy. But Velissaris never admitted that his alterations were done to artificially inflate the values; he admitted only that he increased the values. As his expert testified, BVAL was systematically undervaluing the swaps, so Velissaris's changes that increased the BVAL valuations made Infinity Q's valuations consistent with the highly volatile market conditions. And a simple fact confirms that Velissaris did not plead guilty to the

reinterpreted theory of fraud: neither the government nor the court required him to admit during his allocution that he made alterations to depart from true value, nor did they put on any evidence during the plea that would support that theory.

As to the restitution amount, restitution may be based on a reasonable approximation, but that approximation must rest on a sound methodology. Here, it did not. In fact, the district court said it was "largely immaterial" whether BVAL was reliable, but that assertion is directly contrary to this Court's precedents overturning restitution calculations that rested on an unreliable methodology. Further, the fact that BVAL was not reliable is evidenced by the SEC's own settlement with Bloomberg, which found that BVAL was not reliable for thinly traded securities, because its observed-comparables algorithm could result in a valuation based on a single uncorroborated input. And expert testimony also demonstrated that BVAL systematically undervalued the swaps at issue and did not accurately reflect market reality, yet the district court did not address this testimony and refused to have a hearing on the issues.

## STANDARD OF REVIEW

This Court "review[s] a district court's denial of a motion to withdraw a guilty plea for abuse of discretion and any findings of fact in connection with that decision for clear error." *United States v. Overton*, 24 F.4th 870, 874 (2d Cir. 2022).

This Court has identified several factors "as relevant in assessing a motion to withdraw a plea, including (1) whether the defendant asserted his legal innocence in his motion to withdraw; (2) the amount of time between the plea and the motion to withdraw; and (3) whether the government would be prejudiced by withdrawal of the plea." *United States v. Overton*, 24 F.4th 870, 879 (2d Cir. 2002). It is axiomatic that legal innocence is the most important factor; a showing of legal innocence outweighs any delay or assertion of prejudice by the government. *See United States v. Mitchell*, No. 2:07-CR-149TS, 2009 WL 603198, at *2 (D. Utah Mar. 9, 2009), *aff'd*, 633 F.3d 997 (10th Cir. 2011) ("[T]he most important factor, in the Court's mind, is Defendant's assertion of his innocence. The Court believes that this factor, coupled with Defendant's constitutional right to trial by jury, outweigh the prejudice and inconvenience that will arise as a result of the

withdrawal of Defendant's guilty plea."); *United States v. Abdelhadi*, 327 F. Supp. 2d 587, 593 (E.D. Va. 2004) (stating that a credible assertion of actual innocence, or a credible evidence that a plea was not knowing or voluntary, "are clearly the most important" factors).

As to the district court's ruling on restitution, this Court reviews "for abuse of discretion, 'reversing its ruling only if it rests on an error of law, a clearly erroneous finding of fact, or otherwise cannot be located within the range of permissible decisions.'" *United States v. Tanner*, 942 F.3d 60, 67 (2d Cir. 2019).

## ARGUMENT

### I.   Velissaris is actually innocent of disclosure fraud.

#### A.   Velissaris disclosed what he is alleged to have concealed.

The securities-fraud count rested on a disclosure theory—in the words of the district court, on the theory that "Velissaris's conduct constituted securities fraud because he represented to investors that Infinity Q valued its OTC derivative positions using BVAL, an independent valuation service, without substantive input from Infinity Q, when, in fact, Velissaris altered the positions within the BVAL

27

system to manipulate the valuations (the 'Disclosure Theory')." (Op., App. A-962.)

This theory of fraud focused on the independence of the valuation process. To quote from the government's response when resisting a bill of particulars, "the Indictment makes clear that Velissaris made misrepresentations about the *independence of the process* for valuing OTC derivative positions in Infinity Q's portfolio, about *Infinity Q's lack of input* into the valuation of such positions, and about the valuations being *based on the actual terms* of the OTC derivative contracts." (App. A-87–88 (emphasis added).) It then quoted the following "illustrative examples" from the indictment to show "the Government's theory of fraud in this case," all of which focused on the misstatements about the independence of the process:

- "Velissaris misled investors 'that the valuation of Infinity Q's OTC derivative securities would be done using an *independent* third-party service, *without Infinity Q's input* into the models, and *based on the true terms of the underlying securities*'" (App. A-87 (quoting Indictment, App. A-25 ¶ 2) (emphasis added));

28

- "Velissaris stated that Infinity Q '*removed*' *itself* from the valuation of OTC derivative positions to allow BVAL to remain *independent*" (App. A-87–88 (quoting Ind., App. A-34 ¶ 24) (emphasis added));

- Velissaris made false and misleading statements concerning *Infinity Q's process* for valuing OTC derivative positions" (App. A-88 (quoting Ind., App. A-35 ¶ 25) (emphasis added));

- "Velissaris' representations concerning the *independence of the process* for valuing OTC derivative positions was inconsistent with his actual process" (App. A-88 (citing Ind., App. A-35 ¶ 26) (emphasis added)).

- "Velissaris regularly lied about the nature of Infinity Q's valuation of OTC derivatives, including by representing that BVAL was providing *independent*, third-party valuations for OTC derivative positions, *when in fact, Velissaris had substantial input* into the modeling of those positions" (App. A-88 (quoting Ind., App. A-42 ¶ 35) (emphasis added)).

29

Notably, none of those allegations suggested that the government would consider it any less fraudulent if Velissaris made alterations that brought the valuations closer to their true value.

And that is how Velissaris understood the government's case. (*E.g.*, Tr., App. A-296 (Velissaris's counsel: "The government has clarified again and again that they have not tried to establish the true value of the assets but, rather, are taking issue with representations about whether or not BVAL was independent, that there was a process for valuation in which BVAL was independent, and that that's the crux of their case.").) His guilty-plea allocution demonstrates this. After stating that he "made false statements of material fact . . . with the intent to defraud," he immediately explained that he is referring to statements about the independence of BVAL: "Specifically, I told investors that I was using an independent Bloomberg system to value the fund's over-the-counter derivatives," when in fact he "was making manual adjustments in the system which increased the values of the over-the-counter derivative positions that were reported"—which was conduct that the prospectus disclosed to investors. (App. A-425.)

In advancing this specific fraud theory, the government itself had asserted that "[t]hese promises of an independent, third-party valuation system were critical to investors' decision to invest in such a complex and opaque trading strategy" and that "the independence of the BVAL valuation process" was "an independence that investors cared deeply about." (ECF 106 at 9.) That is why Velissaris admitted during his guilty plea that he knew that if he disclosed that he was making manual adjustments, then "investors might have decided to redeem their investments or maybe would not have made the investments in the first place." (App. A-425.) Significantly, Velissaris did not admit that his alterations were to decrease the accuracy of the valuations; he admitted only that they "increased the values" of the derivatives. (App. A-425, 426.)

The problem with this theory is that Velissaris repeatedly disclosed that Infinity Q was free to depart from the BVAL valuations when, in its judgment, Infinity Q deemed it appropriate to assign a reasonable valuation. It is not securities fraud to follow the valuation process that is set out in the prospectus, the annual report, and the other disclosure documents.

This situation is like the alleged valuation misrepresentation in
*I. Meyer Pincus & Associates, P.C. v. Oppenheimer & Co.*, 936 F.2d 759
(2d Cir. 1991). In *Pincus*, an investor alleged that a fund made a
"material misrepresentation about the trading value" of a fund in
violation of § 10(b). *Id.* at 761. The investor argued that a statement
that shares are "expected to trade at a discount or premium" was
misleading because the shares typically sell at a discount and
infrequently at a premium. *Id.* This Court held that the allegations did
not state a § 10(b) claim because the prospectus's valuation section
"states exactly the 'fact' that Pincus contends has been covered up . . . ."
*Id.* at 762. Given the prospectus's language, "[n]o reasonable investor
would be misled by the prospectus . . . ." *Id.*

The same is true here. Here, the prospectus's valuation section
states that its valuations would not rest solely on an independent
pricing service, but rather would ultimately be based on Infinity Q's
own judgment if it determined the independent valuation was not
reasonable. The mutual fund's prospectus expressly states that when
"the Fund's pricing service . . . provides a valuation that *in the judgment
of the Adviser* does not represent the security's fair value," then Infinity

Q will itself value the security using a process that "involves *reliance on judgment*." (App. A-740 (emphasis added).) No reasonable investor reading this language—or similar language in the other disclosures—would believe that Infinity Q would be relying solely on the independent Bloomberg valuations and not also on Infinity Q's own judgment.

In fact, this Court has also recognized that it is unreasonable as a matter of law for an investor to rely on a statement that contradicts the offering materials or the prospectus. *E.g.*, *Olkey v. Hyperion 1999 Term Tr.*, Inc., 98 F.3d 2, 9 (2d Cir. 1996) (holding that misrepresentations were "immaterial since they are contradicted by plain and prominently displayed language in the prospectuses").

In *Olkey*, a group of investors alleged securities fraud on the theory that the prospectuses were misleading and that "the defendants misrepresented the riskiness of the Trusts in the presentations, known as roadshows, which they gave to potential brokers." *Id.* at 3, 4. This Court concluded that this theory failed to state a claim. *Id.* at 3. This Court recognized that the defendants' disclosures informed the investors that "the value of losses if [interest] rates dropped could exceed the value of profits if rates rose," which was "the very bias which

plaintiffs claim was not disclosed." *Id.* at 7. "No reasonable investor could have relied on perfect balancing because that was not promised." *Id.* And this Court rejected the investors' attempt to rely on statements outside the prospectuses: "Representations made by the defendants at the roadshows are immaterial since they are contradicted by plain and prominently displayed language in the prospectuses." *Id.* at 9.

The same reasoning applies here. "No reasonable investor could have relied" on Infinity Q's use of a completely independent valuation tool "because that was not promised." *Id.* at 7. As in *Olkey*, the plain language in the prospectus—and here also in the annual report, memos, and manual—contradicted any statement that Infinity Q would rely solely on an independent pricing system. *See also Dodds v. Cigna Securities, Inc.*, 12 F.3d 346, 351 (2d Cir. 1993) ("Nor can a plaintiff rely on misleading oral statements to establish [a § 10(b)] unsuitability claim when the offering materials contradict the oral assurances"); *Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1031 (2d Cir. 1993) (holding that "reliance on the oral statements" was "not justified as a matter of law" where "the alleged oral statements are contradicted by the offering materials sent to the Limited Partners"); *Halperin v.*

34

*eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002). If it is true, as the government asserted, that "the independence of the BVAL valuation process" was "an independence that investors care deeply about" (ECF 106 at 9), then any reasonable investor would read the prospectus and other disclosures and would realize that the funds did not promise that independence.

As this Circuit's decisions in *Pincus*, *Olkey*, *Dodds*, and *Brown* all show, a claim under Rule 10(b) fails, even in the civil context, when the written materials disclose the relevant information. *See, e.g.*, *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 580 (S.D. Tex. 2002) ("Although criminal violations of § 10(b) require a showing that the act was done willfully, the elements of a civil and criminal violations of the statute are otherwise the same, and courts in criminal cases frequently cite civil interpretations of the statute to determine whether there has been a violation."). Here, an investor who simply read the prospectus (or other disclosures) would learn that Infinity Q would *not* treat BVAL as an independent valuation tool to be followed without any adjustment based on Infinity Q's own judgment. *Brown*, 991 F.2d at 1032 ("An investor may not justifiably rely on a

misrepresentation if, through minimal diligence, the investor should have discovered the truth."). And the mismarking theory fails for the same reasons, as it rests on the theory that *any* departure from BVAL "as the independent method" is fraudulent, whether the changes were "objectively correct or not." (Op., App. A-967.)

Given that the facts alleged by the government fail to state a claim, Velissaris is innocent of violating Rule 10(b). *United States v. McIntosh*, 704 F.3d 894, 906 (11th Cir. 2013) ("One simply cannot be convicted by pleading guilty to conduct that is not a crime."). That is why a court must determine that the admitted conduct "is in fact an offense": "to 'protect a defendant who is in the position of pleading voluntarily with an understanding of the nature of the charge but without realizing that his conduct does not actually fall within the charge.'" *United States v. Maher*, 108 F.3d 1513, 1524 (2d Cir. 1997) (quoting *McCarthy v. United States*, 394 U.S. 459, 467 (1969)).

## B.    Velissaris did not admit to the alternate theory of fraud that the court relied on.

Instead of relying on the theory of fraud to which Velissaris pled guilty, the court reframed the theory: "The Government's theory was that the defendant did not disclose that, despite specific representations

36

to the contrary, he manipulated BVAL's valuations *to inflate artificially* the value of Infinity Q's assets." (Op., App. A-965 (emphasis added).) Similarly, when discussing the mismarking, the court asserted that Velissaris "took BVAL calculations—*objectively correct or not*—and inflated them when he chose, not to make them more accurate, but *to increase artificially* the value of the positions held by the Funds and *thereby inflate* [net asset values]." (App. A-967–68 (emphasis added).)

The problem with these assertions is that Velissaris never admitted that he was altering valuations to obscure true value. His allocution simply does not say that (App. A-425–26); it says only that he made alterations "[t]o increase the value of the securities being held by the fund." (App. A-426; *see also* App. A-425 ("I was making manual adjustments in the system which increased the values").)

And there is an innocent explanation for why Velissaris would increase the valuations to make them more accurate: as Velissaris's expert explained, "because Infinity Q was a 'net buyer of volatility,' its portfolio of variance swaps would have been expected to increase in value during that time, but BVAL, due to problems with its modeling programs, systematically undervalued variance swaps." (App. A-933; *see*

*also* App. A-936 (repeating that Velissaris could move for the admission of the expert's testimony at trial); App. A-119 ¶ 6 (expert report noting that during March 2020, an index of volatility "rose by 314% relative to its value in January 2020," but in contrast, BVAL's valuation of the sum of the swaps "declined by 600% over the same period," which was a result "not consistent with market reality"); App. A-912 ¶ 4(d) ("IQ's assigned values of the variance swaps were consistent with prevailing market conditions of highly elevated volatility.").) Significantly, neither the government nor the court required him to admit that his alterations were done to depart from "true" value, even though that factual basis would be necessary if the theory of fraud to which he was pleading guilty was based on him artificially inflating the value of the derivatives.

In opposing Velissaris's withdrawal of his guilty plea, both the government and the district court rely on facts that Velissaris did not admit or that were not put in the record during the plea. *Irizarry v. United States*, 508 F.2d 960, 967 (2d Cir. 1974) ("Any additional facts on which the court relies in determining that there is a factual basis for the plea must be put into the record at the time of the plea."). The

38

primary example of this is the one just discussed—that his valuations departed from the "true" value of the derivatives. As to that, even the government's expert, Dr. Sabry, never testified as to what the "true" value of the over-the-counter swaps were. (App. A-310 (district court agreeing that "Dr. Sabry and the government admit she is not trying to calculate true value"); *see United States Commodity Futures Trading Comm'n v. Wilson*, No. 13 CIV. 7884 (RJS), 2018 WL 6322024, at *11, *13 (S.D.N.Y. Nov. 30, 2018) (concluding that the CFTC failed to carry its burden of proof about price manipulation of a type of over-the-counter way where "the CFTC's own expert, MacLaverty, gave no testimony as to the fair market value of the contract" and had "no evidence" showing that the "prices were artificially high").

For another example, when it opposed his motion in this Court for release pending appeal, the government also recited unproven allegations that he did not admit—that he provided falsified documents to an outside auditor, that he altered Infinity Q materials, and that he fabricated minutes for a valuation committee. (Opp'n ¶¶ 17–19.) Velissaris did not plead guilty to the counts those facts related to. Similarly, the district court faulted Velissaris for "offer[ing] no evidence

. . . that the valuation committee approved the alterations he made to BVAL or the inputs to BVAL." (App. A-965 n.15; *see also* App. A-930.) The government, not defendant, bears the burden of proof on each of those points, and Velissaris did not admit those facts, nor were they supported by evidence put in the record during the plea. Accordingly, they are not a proper basis for denying him leave to withdraw his guilty plea as to the securities-fraud count. *Irizarry*, 508 F.2d at 967.

Further, the fact that Velissaris stated during his guilty plea that he acted "with the intent to defraud" (App. A-425) does not by itself make his conduct illegal. After all, intent alone, without a criminal act, is not sufficient to make a crime. For example, the doctrine of "pure legal impossibility" demonstrates that intent alone is insufficient. "[T]he concept of pure legal impossibility applies when an actor engages in conduct that he believes is criminal, but is not actually prohibited by law: 'There can be no conviction of criminal attempt based upon D's erroneous notion that he was committing a crime.'" *People v. Thousand*, 465 Mich. 149, 159 (2001) (quoting Perkins & Boyce, Criminal Law (3d ed.), at 634); *id.* at 158 ("it is generally undisputed that 'pure' legal impossibility will bar an attempt conviction"); *see also United States v.*

40

*Hsu*, 155 F.3d 189, 199 n.16 (3d Cir. 1998) ("Pure legal impossibility is always a defense. For example, a hunter cannot be convicted of attempting to shoot a deer if the law does not prohibit shooting deer in the first place."); *United States v. Fernandez*, 722 F.3d 1, 31 (1st Cir. 2013); *United States v. Farner*, 251 F.3d 510, 513 & n.2 (5th Cir. 2001). Thus, even if Velissaris had an intent to defraud investors, the fact that he actually disclosed to investors that he would apply his own judgment and not blindly follow BVAL means that he did not commit disclosure fraud.

## II.   Even if Velissaris is not allowed to withdraw his guilty plea, the restitution amount should be vacated because it rests on an unsound methodology, and the amount of loss underlying his sentence should be recalculated.

While this Court has concluded that "the amount of restitution ordered" may be "'reasonable approximation of losses,'" it has nonetheless required that the approximation be "'supported by a sound methodology.'" *United States v. Tanner*, 942 F.3d 60, 67 (2d Cir. 2019) (quoting *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013)). This Court has thus rejected restitution amounts that fail to follow a sound methodology. *Id.* at 67 (vacating and remanding restitution

41

award); *United States v. Finazzo*, 850 F.3d 94, 118 (2d Cir. 2017) (vacating and remanding restitution award).

For example, in *Tanner*, a district court ordered $8 million in restitution based on a flawed methodology. The fraud arose in connection with a pharmaceutical company's negotiations to buy an option to acquire a specialty pharmacy; specifically, an employee of the pharmaceutical company secretly advised the other side of the transaction (the specialty pharmacy) during the negotiations. During the course of the negotiations, the price for the option rose by $8 million, and the district court ordered the defendant employee to pay $8 million in restitution. *Tanner*, 728 F.3d at 63–64, 65, 67. This Court reversed the restitution award: "That amount—which represents nothing more than the difference between [the pharmaceutical company's] initial offer and the final purchase price of the option to buy [the specialty pharmacy]—does not attempt to approximate any increase in cost that is *attributable to the defendants' criminal conduct*." *Tanner*, 942 F.3d at 67 (emphasis added). "It is therefore not a 'reasonable approximation of losses supported by a sound methodology.'" *Id.*

42

As another example, this Court vacated a restitution penalty in *United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017), because the restitution calculation was based on a flawed methodology. The underlying fraud occurred when a merchandising executive for a retailer caused the retailer to use a particular clothing vendor as its supplier of T–shirts and fleeces in exchange for secret payments to the executive. *Id.* at 96. The merchandising executive caused the retailer to purchase merchandise at higher than the market rate and in exchange received 50% of the clothing vendor's profits. *Id.* at 97. In calculating the amount of restitution, the district court concluded that this scheme "inflated prices" that the retailer paid to the vendor in exchange for kickbacks paid to the merchandising executive. *Id.* at 116. The district court also concluded that the value of the kickbacks was "a reasonable measure of the pecuniary loss suffered" by the retailer." *Id.* This Court vacated the restitution, concluding that it was "not convinced that the district court employed a sound methodology that supported a conclusion that there was a 'direct correlation'" between the merchandising executive's gains and the retailer's losses. *Id.* at 118. This Court recognized that the loss was "not a *necessary* consequence of

all the kickbacks [he] received." *Id.* It noted that even without inflating
the price, the vendor would receive some profit from sales to the
retailer, and that conduct such as steering additional business to the
vendor and reducing transaction costs for it could have justified some of
the kickbacks. In short, "it [was] not a sufficiently sound methodology
for the district court to merely assume that the kickbacks were *solely*
justified by inflated prices." *Id.*

As in *Tanner* and *Finazzo*, the district court here failed to follow a
sound methodology for demonstrating that the losses suffered—
allegedly $126 million—were directly caused by the alleged criminal
conduct. The district court rests the restitution award on the premise
that "both Funds *overpaid* shareholders for certain [over-the-counter]
derivative positions that were marked at an *artificially inflated value*."
(Op., App. A-1018–19 (emphasis added).) But when Velissaris noted
that BVAL is not reliable for determining the true value of the
derivatives, the district court responded that "whether BVAL is a
reliable tool is largely immaterial"; according to the district court,
because Velissaris chose to use BVAL but then altered its input,
"revaluing the securities by using BVAL without fraudulent alterations

is a reasonable method of approximating the losses caused by the defendant's fraud." (App. A-1021.)

The district court's reasoning suffers from two fundamental flaws. First, the court is wrong in saying that BVAL's reliability is immaterial. The court is mistaking whether it was immaterial on one issue (whether the alterations were *wrongful*) with whether it was immaterial on another issue (whether it supports the accurate *calculation of damages* resulting from that allegedly wrongful conduct). While it might be possible to find wrongful conduct based simply on departing from BVAL (under the government's original theory of fraud, and if Velissaris had not in fact repeatedly disclosed that he could alter the inputs based on his judgment), actually calculating the losses and restitution requires determining the true values.

For example, if Velissaris had promised that he would base the valuations on a random number generator, but then he secretly used a perfect valuation tool, that conduct would have amounted to a misrepresentation about the independence of the valuation process and so would have been wrongful conduct, but there would be no damages. In other words, whether the process is reliable may be irrelevant to

45

whether he made false representations, but the reliability of the valuations is necessarily relevant for calculating an amount of damages. Indeed, the only way to know how much the value was artificially inflated and how much was overpaid by the funds is to know what the true values were at the relevant times. If the true value is not known, then it is not possible to calculate how much the inflated amount was; that is trying to calculate the difference between two numbers without knowing what the second number is. Put simply, the methodology for determining the true value must be reliable to be able to determine how much the values were inflated.

Second, the district court erred in overlooking the evidence, from both the SEC and from Velissaris's expert, showing that BVAL, the tool that at least one of the funds relied on in calculating the restitution amount (ECF 129 at 2), was in fact not reliable. The SEC's own findings state that BVAL was not reliable for thinly traded securities that relied on input from Bloomberg's Evaluator Input Tool. *In the Matter of Bloomberg Fin. L.P. Respondent.*, Release No. 11150, 2023 WL 369464, at ¶ 10 (Jan. 23, 2023). "[T]he use of EIT could, in certain circumstances, result in a valuation based on an uncorroborated single

46

data input." *Id.* at ¶ 11. The district court discounted this evidence by interpreting the SEC's order as finding flaws only with respect to fixed-income securities. (App. A-951.) But the SEC's order explained that it uses its observed-comparables algorithm "[i]f market data is not available or is not corroborated," which is not a condition limited to fixed-income securities. Rather, Bloomberg evaluators can use the BVAL tool for any thinly-traded security, not just fixed-income securities; while the SEC order focused on fixed-income securities, it explained that the methodological flaw applied to "certain illiquid, thinly-traded securities for which little observable market data exists . . . ." *In the Matter of Bloomberg*, 2023 WL 369464 at ¶ 10. Thus, while the district court opined that it did not "appear" that the SEC settlement implicated "the relevant valuation tools in this case," the SEC order shows that EIT is an input into BVAL, which is the tool used in this case. And in fact, any lack of certainty as to whether input came from EIT cuts against relying on BVAL, as the very problem that the SEC order identifies is that BVAL's customers (like Velissaris) "were *unable to determine* that certain BVAL prices were not generated in

accordance with the disclosed methodologies." *In the Matter of Bloomberg*, 2023 WL 369464 at ¶ 12 (emphasis added).

Further, Dr. Saha's report and his declaration in support of the motion to withdraw also show that BVAL is not reliable. He explained that the version of BVAL that Infinity Q used through February 2021, which he called "historic BVAL," "had serious deficiencies." (App. A-119 ¶ 5; App. A-913 ¶ 4(f).) "Bloomberg's script files in historic BVAL had an error, which caused it to *systematically undervalue* a majority of variance swaps at issue." (App. A-119 ¶ 5; App. A-913 ¶ 4(f).) He further explained that "[h]istoric BVAL yielded valuations that were more than 80% lower than the current version of BVAL ('current BVAL') for many swaps at issue" and that "BVAL's valuations were often outside the range of reasonable valuations." (App. A-119 ¶ 5; App. A-913 ¶ 4(f).) He explained that "[c]urrent BVAL's variance swap valuations are generally inconsistent with market reality." (*Id.*) "For example, during the month of March 2020, average VIX index "—a "widely followed measure of market volatility"—"*rose* by 314% relative to its value in January 2020; by contrast, according to current BVAL's output, the sum of the values of the swaps at issue *declined* by 600% over the same

period." (App. A-119 ¶ 6.) "This result," he concluded, "is not consistent with market reality because, as noted earlier, the sum of the size of [Infinity Q's] long positions for the swaps at issue was more than five times larger than the short positions during this time." (App. A-119 ¶ 6; App. A-913 ¶ 4(f).) And the district court did not address these points, refusing even to have a hearing on these issues as requested by counsel, even though Velissaris argued that "BVAL is an inherently flawed tool that does not accurately value the Funds' securities" and cited Dr. Saha's report. (Letter re Restitution, ECF 130 at 10–11; Op., App. A-1020–22; Letter, ECF 113 (requesting hearing).)

In the end, the district court erred as a matter of law—and so necessarily abused its discretion—when it said that the reliability of BVAL "is largely immaterial" to the loss calculations. (App. A-1020.) To the contrary, the reliability of BVAL is crucial, given this Court's recognition that "the amount of restitution ordered must reflect a 'reasonable approximation of losses *supported by a sound methodology*[.]" *Tanner*, 942 F.3d at 67 (emphasis added).

Significantly, this error in the loss calculation does not affect just the restitution amount—it also affects the loss amount used to calculate

Velissaris's guidelines range. He received 24 points based on the amount of the loss, and with a lower amount of loss, he would have received a correspondingly lower level of points. *See* U.S. Sentencing Guidelines § 2B1.1(B)(1). Even if this Court were to uphold Velissaris's conviction, it should nonetheless vacate the restitution calculation and remand to recalculate the loss and to adjust his sentence as appropriate based on more accurate loss and restitution amounts.

## CONCLUSION

For these reasons, this Court should reverse the district court's denial of Velissaris's motion to withdraw his guilty plea and vacate the restitution penalty.

Respectfully submitted,

Dated: September 5, 2023

By  */s/  Aaron D. Lindstrom*
AARON D. LINDSTROM
**BARNES & THORNBURG LLP**
171 MONROE AVE. SE, SUITE 1000
GRAND RAPIDS, MI 49503
616-742-3931

*COUNSEL FOR APPELLANT*
*JAMES VELISSARIS*

## CERTIFICATE OF COMPLIANCE

I certify that, pursuant to Federal Rule of Appellate Procedure 32 (a)(7)(B) and Second Circuit Rule 32.1(a)(4)(A), the attached opening brief is proportionately spaced, has a typeface of 14 points or more and contains 9,730 words.

Dated:  September 5, 2023          **BARNES & THORNBURG LLP**

By:  _/s/ Aaron D. Lindstrom_

AARON D. LINDSTROM
**BARNES & THORNBURG LLP**
171 MONROE AVE. SE, SUITE 1000
GRAND RAPIDS, MI 49503
616-742-3931

*COUNSEL FOR APPELLANT*
*JAMES VELISSARIS*

51

# No. 23-6379, 23-6953

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

**UNITED STATES,**

*Plaintiff-Appellee*

*v.*

**JAMES VELISSARIS, AKA SEALED DEFENDANT 1**

*Defendant-Appellant*

Appeal from the United States District Court for the
Southern District of New York
Hon. Denise Cote, District Judge
Case No. 22-cr-105

**Appellant's Special Appendix**

AARON D. LINDSTROM
**BARNES & THORNBURG LLP**
171 MONROE AVE. SE, SUITE 1000
GRAND RAPIDS, MI 49503
616-742-3931
*Counsel for Defendant-Appellant,*
JAMES VELISSARIS, AKA SEALED DEFENDANT 1

# Appendix Table of Contents

## Volume 1

Docket ................................................................................................ 1

Indictment (ECF Dk# 1) ................................................................. 24

Government Opposition Motions in Limine (ECF Dk# 23) ................ 57

## Volume 2

Government Opposition Motions in Limine, continued
(ECF Dk# 23) ............................................................................. 86

## Volume 3

Government Opposition Motions in Limine, continued
(ECF Dk# 23) ........................................................................... 159

Saha Report (ECF Dk# 55-1) ........................................................ 113

## Volume 4

Saha Report, continued (ECF Dk# 55-1) .................................................

Presentence Report (ECF Dk# 83) ................................................ 228

## Volume 5

Presentence Report, continued (ECF Dk# 83) ................................ 260

Transcript on Hearing on Motions in Limine (ECF Dk# 70) ............ 268

Plea Agreement ............................................................................ 407

Transcript For Guilty Plea (ECF Dk# 72) ...................................... 413

Compliance Policies and Procedures Manual (ECF Dk# 95-1) .......... 432

Private Placement Memo, Infinity Q Volatility Alpha Fund
(ECF Dk# 95-2) ......................................................................... 589

Private Offering Memo, Infinity Q Volatility Alpha Offshore Fund (ECF Dk# 95-3)............................................................................ 648

Prospectus, Infinity Q Diversified Alpha Fund (ECF Dk# 95-4) ....... 715

**Volume 6**

Prospectus, Infinity Q Diversified Alpha Fund, continued (ECF Dk# 95-4) ................................................................................. 797

Policies and Procedures for Valuing Portfolio Securities and Assets (ECF Dk# 95-5) ............................................................... 834

Annual Report, Infinity Q Diversified Alpha Fund (ECF Dk# 95-6) . 855

Saha Declaration (ECF Dk# 95-8) ...................................................... 910

Opinion Denying Withdrawal Of Plea (ECF Dk# 116) ...................... 919

Judgment (ECF Dk# 117). ................................................................... 977

Opinion Denying Release Pending Appeal (ECF Dk# 123)................ 984

Opinion On Restitution (ECF Dk# 139) ............................................. 999

Amended Judgment (ECF Dk# 144)................................................. 1027